(C. D. 993)

Standard Synthetics Co. *v.* United States

## United States Customs Court, First Division

(Decided March 27, 1946)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao*, Assistant Attorney General (*Robert C. O'Grady* and *Richard F. Weeks*, special attorneys), for the defendant.
*Lamb & Lerch* (*Kenneth G. Osborn* of counsel) *amici curiae.*

Before OLIVER, COLE, and MOLLISON, Judges .

MOLLISON, Judge: These suits were filed by the plaintiff seeking to recover certain sums of money alleged to have been illegally exacted as customs duties upon two importations of merchandise which were classified by the collector of customs under the following provision in paragraph 60 of the Tariff Act of 1930 as modified by the French Trade Agreement, T. D. 48316:

Perfume materials: All mixtures or combinations containing essential or distilled oils, or natural or synthetic odoriferous or aromatic substances, not containing more than 10 per centum of alcohol.

with consequent assessment of duty at the compound rate of 40 cents per pound and 30 per centum ad valorem. The contention of the plaintiff is that the shipments consist of essential or distilled oil of cassia in one case and of lavender in the other; and that they are entitled to free entry under the *eo nomine* provision therefor in paragraph 1731 of the free list of the said act, which reads as follows:

PAR. 1731. Oils, distilled or essential: Anise, bergamot, bitter almond, camphor, caraway, cassia, cinnamon, citronella, geranium, lavender, lemon-grass, lime, lignaloe or bois de rose, neroli or orange flower, origanum, palmarosa, pettigrain, rose or otto of roses, rosemary, spike lavender, thyme, and ylang ylang or cananga: *Provided,* That no article mixed or compounded with or containing alcohol shall be exempted from duty under this paragraph.

Other claims were made by timely amendment of the protests, and while none was specifically waived or abandoned, they were not pressed and do not seem to be applicable in the light of the record as made. They are therefore overruled.

It was agreed by and between counsel at the trial that the merchandise was not mixed or compounded with, and did not contain alcohol.

In view of the fact that the evidentiary situation with respect to the alleged oil of cassia differs from that with respect to the alleged oil of lavender, we will consider them separately, taking the oil of cassia first.

The evidence offered on behalf of the plaintiff consists of the testimony of John Leslie Hindel, its vice president. Mr. Hindel had had some 21 years' experience in the distillation, buying, and selling of

essential oils, and had had training and experience as a chemist. He defined the term "essential oil" as—

\* \* \* an oil derived from a plant or an herb or a fruit either by distillation or by pressure. It is used as a flavor or a perfume.

Generally speaking, he said, "essential oils" and "distilled oils" mean the same thing, although "an essential oil can be obtained from a plant or a fruit without distillation, but usually it is obtained by distillation."

He stated that in the purchase of essential or distilled oil he relied upon four factors, viz, odor, flavor, pedigree, and independent chemical analysis, to determine whether it was a pure essential or distilled oil.

The so-called oil of cassia was purchased by him in London in the original lead containers in which it came from China. He personally tested it by the odor test and was satisfied as to its pedigree by his knowledge of the shipper as being reputable, but finding that it contained small traces of impurity, such as lead and heavy metals (presumably from the containers in which it was shipped), he redistilled it to purify it. He then sent a sample of the rectified oil to a public analyst in London, and concluded from the report submitted and from his own examination based upon his experience that it was pure essential oil of cassia. It was then shipped to the United States and sold to a firm of confectioners in Chicago as cassia oil.

Harold B. Mead, a Government chemist, in charge of the organic laboratory of the United States Customs Service, who had some 38 years' experience in the examination of essential oils, testified for the defendant that he received a sample of the alleged oil of cassia here involved and made an analysis and report thereon.

Mr. Mead stated that cassia oil is composed chiefly of and derives its character from cinnamic aldehyde, and since this aldehyde is made artificially, synthetically, from coal tar in such pure state that it cannot be distinguished from the natural cinnamic aldehyde in cassia oil, no deduction can be made by examination of the aldehyde portion of a compound containing it as to whether the said compound was natural, synthetic, or a mixture of the two.

The cinnamic aldehyde was therefore removed from the sample and the nonaldehyde portion examined. He found that this had a saponification value of 50 as compared with a saponification of 150 to 180 found in analysis of "hundreds of samples of cassia oil from China," and that it had an odor strongly suggestive of eugenol, a constituent "we have never found in cassia through our experience nor in the literature stated to be a constituent of cassia."

Other tests were performed by removing the phenols, forming a solution, and testing with ferric chloride, resulting in a "beautiful bluish green" color, such as is obtained with eugenol. A similar test with ferric chloride upon the original sample gave a yellowish-green color, whereas the color is brown in the case of oil of cassia.

The significance of the presence of eugenol in a substance such as that at bar is explained by Mr. Mead's testimony at page 33 of the stenographic transcript as follows: '

\* \* \* When artificial cinnamic aldehyde is used to synthesize a cassia oil it must be adjusted by other-chemicals in order to conform to the ordinary standards, the ordinary tests given in the pharmacopoeia and other authorities. Various things are used to make this adjustment. In this case something apparently was used containing eugenol to make it appear like cassia oil.

A test involving the formation of crystals in fractions of distillation showed no crystals formed in the fractions obtained from the sample, while they were always formed in the fractions of the pure oil. Mr. Mead also related experience with oils which had been found to be mixtures, "and every time we examined one of those oils and distilled them we got no crystals."

In its brief filed herein counsel for the plaintiff contends that the record shows that the involved merchandise was commercially known and bought and sold as essential or distilled cassia oil and that the case is therefore controlled by the decision of this court in *Fritzsche Bros.* v. *United States*, 7 Treas. Dec. 49, T. D. 24905 (G. A. 5535), wherein it was held that the provision for oil of cassia in the Tariff Act of 1897 covered all merchandise commercially known by that name, whether natural or artificial.

We have carefully examined the record and do not think that it supports the plaintiff's contention. As we view it, the record establishes that the particular shipment of merchandise in question passed into and through commerce in this country as oil of cassia. It is clear that Mr. Hindel, for the plaintiff, at least, and quite probably the person from whom he bought it and the person to whom he sold it, believed that it was natural oil of cassia. This is so, for Mr. Hindel was emphatic in pointing out that he satisfied himself as to the pedigree of the oil before he purchased it, and there would be no point in such inquiry were it not for the purpose of securing the natural oil.

The effect of the evidence offered by the defendant as to the presence of eugenol and as to the dissimilarity in results of tests performed upon a sample of the importation and those performed on known standards is to refute the testimony of Mr. Hindel that the substance before us is a natural oil, and to establish that it is an artificial or synthetic oil or a mixture of natural and artificial or synthetic oils. Whether Mr. Hindel would have rejected the merchandise had his investigations disclosed that it was artificial or synthetic oil of cassia or a mixture of natural and artificial or synthetic oils, or what would have been the reaction of his purchaser, is not disclosed by the record.

This record differs from that in the *Fritzsche Bros.* case, *supra*, in that there is no evidence that the trade regarded artificial or synthetic

oil of cassia, or mixtures of natural and artificial or synthetic oils, as: cassia oil. The common meaning of the term as gathered from Funk & Wagnalls New Standard Dictionary (1942), Webster's New International Dictionary (1945), and such standard authorities as The Condensed Chemical Dictionary and Hackh's Chemical Dictionary (3d ed.), refers only to the natural product, and, indeed, Mr. Hindel's own definition of essential oils, hereinbefore quoted, refers only to oils derived from natural sources.

The holding of the court in the *Fritzsche Bros.* case that the commercial meaning of the term "oil of cassia" as found in paragraph 626 of the Tariff Act of 1897 included such oil produced artificially as well as that obtained from natural sources does not aid the plaintiff here. That case arose under the act of 1897, while the present case is governed by the provisions of the Tariff Act of 1930, and although cassia oil is specifically provided for in each act, it is well settled that commercial meaning of a tariff term is a fact to be proved in each case and must be that which is in existence prior to and at the date of the passage of the tariff act in question. *Wanamaker* v. *United States*, 13 Ct. Cust. Appls. 93, T. D. 40939.

Therefore, if it were the plaintiff's purpose to claim that oil of cassia, whether produced by synthesis or artificially, as well as the product of natural sources, or mixtures thereof, was entitled to free entry under the provision for cassia oil in paragraph 1731, proof should have been adduced of a commercial meaning of the term as found in the Tariff Act of 1930 including such artificial or synthetic oil or mixtures thereof with natural oil. The record contains no such proof.

The issues and the record as to the so-called oil of cassia herein are closely parallel to those found in the case of *United States* v. *P. R. Dreyer, Inc.*, 28 C. C. P. A. 325, C. A. D. 162. In that case certain so-called Spanish origanum oil was assessed with duty under the identical provisions of paragraph 60 as the merchandise at bar, and free entry was claimed as essential oil of origanum under paragraph 1731, *supra.* There was strong evidence offered by the plaintiff that the importation met the commercial requirements for a good delivery of origanum oil, but, as in this case, there was evidence offered on behalf of the defendant that the merchandise contained, in small degree, a coal-tar substance not naturally present in origanum oil which suggested the inclusion of artificial ingredients in substantial amounts. The court held that it followed that the merchandise must be a mixture of some kind containing the artificial ingredient, or a straight synthetic origanum oil made from a coal-tar product.

So in the case at bar. The presence of the eugenol indicates that the so-called oil of cassia is either a mixture or a combination containing a synthetic aromatic substance, to wit, artificial cinnamic aldehyde

or was wholly an artificial or synthetic oil. In the *Dreyer* case, *supra*, the court held that since the record showed that the oil was *either* such a mixture as is covered by paragraph 60 or a straight synthetic article possibly not covered by the said paragraph, the importer had not met the burden of establishing that it was *not* a mixture covered by paragraph 60, and we think a like holding is warranted in the case of the so-called oil of cassia here involved.

With reference to the so-called lavender oil, Mr. Hindel testified that he purchased it from what he considered to be a very reputable house in Paris after personally examining what was said to be a one-ounce sample furnished by the seller. It was shipped, after purchase, from Paris to London and thence to the United States without the airtight containers having been opened, and it was later sold and re-exported to a perfume house in Cuba. As in the case of the so-called cassia oil, it was purchased and sold by Mr. Hindel as pure essential oil, and it was his opinion, based upon his examination of the sample and his experience, that it was oil of lavender.

We think it is a fair characterization of Mr. Hindel's testimony with respect to the so-called lavender oil to say that he knew nothing about the composition of the imported merchandise except what the exporter in France told him. As he put it, "I just have the word of the seller. I have to trust a reputable dealer for that."

Testifying on behalf of the defendant, Mr. Mead said that three samples of the so-called lavender oil were supplied him. Samples 1 and 2 were subjected to specific gravity and optical rotation tests and the results were different from "the normal curves," presumably those obtained from known standards. The extent of the difference and its materiality were not revealed except by inference from Mr. Mead's conclusion that the samples did not represent lavender oil.

Sample 3 was subjected to vacuum distillation and separation of the fractions, and the refractive indices of the fractions were taken. The last two fractions had "an ionone-like odor never encountered in lavender" and the entire sample had "chemical consonants more like lavandin and not lavender, which is a cross between lavender and spike lavender." From these tests it was his opinion that the merchandise was not lavender oil.

Whatever may be said as to the persuasiveness of the evidence offered on behalf of the defendant, we are satisfied that the plaintiff failed to make out a *prima facie* case in favor of its contention with respect to the lavender oil.

For the foregoing reasons the claims in each of the protests are overruled, and judgment will issue accordingly.